UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
--------------------------------------------------------------------X
SHORELINE POOLS, INC.,

                         Case No.: 3:24-cv-01762 (OAW)

              Plaintiff,

      v.

LEGACY RENOVATIONS & POOL SERVICE, INC.,

              Defendant.
--------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

**THE LAW OFFICES OF**
**NEAL BRICKMAN, P.C.**
Neal Brickman, Esq. (*pro hac vice*)
420 Lexington Avenue, Suite 2811
New York, NY 10107
Telephone: (212) 986-6840
Facsimile: (212) 986-7691
neal@brickmanlaw.com

Ethan Y. Leonard, Esq. (*pro hac vice*)
420 Lexington Avenue, Suite 2811
New York, NY 10107
Telephone: (212) 986-6840
Facsimile: (212) 986-7691
ethan@brickmanlaw.com

**PHILIP RUSSELL, LLC**
Philip Russell, Esq.
Federal Bar No. ct03127
1 River Road
Cos Cob, CT 06807
Tel: (203) 661-4200
E-mail: efile@greenwichlegal.com
*Attorneys for Plaintiff Shoreline Pools, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................ii

PRELIMINARY STATEMENT......................................................................................1

STATEMENT OF FACTS .............................................................................................3

LEGAL STANDARD ....................................................................................................6

ARGUMENT .................................................................................................................7

    I.     The Court Should Grant Shoreline's Preliminary Injunction
         Because It Will Succeed on the Merits of All of Its Claims .....................................7

         A.  Shoreline Is Likely to Succeed on the Merits of Its
              DTSA Claim.......................................................................................7

         B.  Shoreline Is Likely to Succeed on the Merits of Its
              CUTSA Claim....................................................................................9

         C.  Shoreline Is Likely to Succeed on the Merits of Its
              Lanham Act Claim ...........................................................................12

         D.  Shoreline Is Likely to Succeed on the Merits of Its
              CUTPA Claim ..................................................................................14

          E.  Shoreline Is Likely to Succeed on the Merits of Its
              Tortious Interference Claim ............................................................15

          F.  Shoreline Need Only Show Its Claims Raise Sufficiently Serious
              Questions Going to the Merits to Make Them Fair Ground for
              Litigation and the Balance of Hardships Tip Decidedly in Its Favor .................16

    II.    The Court Should Grant Shoreline's Preliminary Injunction Because Shoreline
         Suffers and Will Continue to Suffer Irreparable Harm Without a
         Preliminary Injunction ..............................................................................17

    III.   The Court Should Grant Shoreline's Preliminary Injunction Because the Equities
         Balance in Shoreline's Favor ....................................................................19

    IV.   The Court Should Grant Shoreline's Preliminary Injunction Because Granting
         Shoreline's Preliminary Injunction Is in the Public Interest .......................................20

CONCLUSION.............................................................................................................21

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page(s)**

*A.H. Harris & Sons, Inc. v. Naso*,
    94 F. Supp. 3d 280, 301 (D. Conn. 2015) ......................................................19

*Allen Mfg. Co. v. Loika*,
    145 Conn. 509, 514, 144 A.2d 306 (1958)....................................................11

*Elm City Cheese Company, Inc., et al. v. Federico*,
    752 A.2d 1037, 1044 (Conn. 1999)................................................................11

*Fisher–Price Inc. v. Well–Made Toy Mfg. Corp.*,
    25 F.3d 119, 125 (2d Cir.1994) ....................................................................18

*Illinois Tool Works Inc. v. J-B Weld Co., LLC*,
    419 F. Supp. 3d 382, 405 (D. Conn. 2019),
    <u>modified,</u> No. 3:19-CV-01434 (JAM), 2019 WL 7816510
    (D. Conn. Dec. 20, 2019)................................................................................20

*Lego A/S v. Best-Lock Const. Toys, Inc.*,
    874 F. Supp. 2d 75, 80 (D. Conn. 2012 ...............................................6, 16–19

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) ...................................................20

*Salinger v. Colting*,
    607 F.3d 68, 77, 78 n. 7 (2d Cir. 2010) ...........................................................6

*Univ. of Texas v. Camenisch*,
    451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981)............6, 18

*Weight Watchers Intern. v. Luigino's, Inc.*,
    423 F.3d 137, 144–45 (2d Cir.2005) ............................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)....................6

**Statutes**

15 U.S.C. § 1125(a) ...............................................................................................12

18 U.S.C. §1836(b)(1) .............................................................................................7

18 U.S.C. §1839(3) ..................................................................................................7

18 U.S.C. §1839(5)(B)(ii)(II)...................................................................7

Conn. Gen. Stat. § 20-341(f)...............................................................14

Conn. Gen. Stat. § 35-51(b)(2)(iii) ........................................................9

Conn. Gen. Stat. § 35-51(d) ...........................................................9—10

Conn. Gen. Stat. § 42-110b....................................................14, 15, 20

**<u>Other Authority</u>**

20161890, CRS Summary, 114th Congress (2015-2016)...........................20

Plaintiff Shoreline Pools Inc. ("Shoreline"), by and through its undersigned counsel, respectfully submits this Memorandum of Law in support of its motion for a preliminary injunction. This motion seeks to enjoin Legacy Renovations & Pool Service, Inc. ("Legacy" or "Defendant") (1) from continuing to misrepresent itself as Shoreline and/or as being affiliated with Shoreline; (2) to compel it to remove all of the false and misleading content from its website and social media; (3) to prohibit Legacy from engaging in deceptive communications with Shoreline's clients and/or suppliers; and (4) to prevent it from using and/or misappropriating Shoreline's trade secrets, confidential business information, and/or proprietary data for the purpose of soliciting Shoreline's clients and/or leveraging Shoreline's supplier relationships.

## PRELIMINARY STATEMENT

Shoreline's longstanding stellar reputation and well-established presence in the swimming pool repair, restoration, construction, and service marketplace is being imminently threatened by Legacy, a newly formed competitor created by a current equity shareholder of Shoreline -- Mark Lionetti and his son, a former Shoreline employee -- who now seek to destroy and pillage the family business which was built by Mark's father decades ago, after spending over a decade profiting off of the hard work of others, including most especially, his brother, Shoreline's majority owner, David Lionetti.

Legacy has blatantly engaged in clear and unconscionable deceptive advertising through its attempts at passing itself off as a clone or division of Shoreline, and using Shoreline's story and history as its own, in violation of the Lanham Act and the Connecticut Unfair Trade Practices Act ("CUTPA"). Furthermore, Legacy has misappropriated Shoreline's trade secrets in clear breach of the Defend Trade Secrets Act ("DTSA") and Connecticut Uniform Trade Secrets Act ("CUTSA"), while also tortiously interfering with service contracts between Shoreline and its then existing customers.

As set forth in greater detail below, Shoreline is likely to prevail on the merits of each and every one of its claims because Legacy blatantly stole clients from Shoreline, using Shoreline's proprietary and confidential business information, including its client and client lead lists, its vendor and supplier information, and its pricing information ("Shoreline's Confidential and Proprietary Information"). Furthermore, Legacy has misappropriated Shoreline's history, corporate story, and identity, unfairly trading on its name and reputation. To wit, Legacy has fraudulently held itself out to be a division of Shoreline, with an identical history, attempting to usurp its reputation and goodwill. Legacy has done all of this while not even being properly licensed under the laws of the State of Connecticut – an unfair trade practice violation in and of itself.

Shoreline suffered and continues to suffer irreparable harm because Shoreline has already lost clients due to Legacy's founder stealing Shoreline's Confidential and Proprietary Information, and the confusion caused by Legacy's deliberately deceptive advertising, which, upon information and belief, has caused and will cause customers to choose Legacy instead of Shoreline. Monetary damages simply cannot adequately repair the pre-existing and continuing damage to Shoreline's reputation, goodwill, business opportunities, client trust, and competitive advantage.

The equities balance in favor of Shoreline, who has everything to lose, compared to Legacy who is solely owned by a Shoreline shareholder and his son, seeking to profit from their illegal activity. Granting the injunction is in the public interest because the DTSA, Lanham Act, and CUTPA exist to protect consumers and promote fair competition; the public should not be deceived by Legacy; and the CUTPA, in particular, is intended to serve a remedial purpose. On balance, this Court should grant Shoreline's preliminary injunction to enjoin Legacy from soliciting and servicing former and current service customers of Shoreline, requiring it to remove the false

advertising – i.e. false or misleading statements about Legacy's history – from its website, and stopping Legacy from impersonating Shoreline until the Court decides whether to permanently enjoin this activity.

## STATEMENT OF FACTS

David Lionetti's ("Lionetti") and Mark Lionetti's ("Mark") father, L.F. ("Lou") Lionetti, founded Shoreline in 1969. See Decl. of David Lionetti dated November 12, 2024 (hereinafter "Decl. of DL") ¶ 3. Mark first joined Shoreline in or about April 1969 and was terminated from Shoreline in September of 2023. See Decl. of DL ¶ 7. See Decl. of DL, Exhibit A. Mark owns, and has owned since 2005, thirty percent (30%) of the issued and outstanding stock of Shoreline. See Declaration of David Lionetti ("Decl. of DL") ¶ 5, 7.  David A. Lionetti, Mark's son, began working for Shoreline in its service and maintenance division in 2005. See Decl. of DL ¶ 8.

According to its website, Shoreline conducts business "along the Northeast coast and within the New York Tri-state area." Shoreline's website tells the truthful story of its founding. "Shoreline Pools was founded in 1969 as a small, family-owned swimming pool construction company in Connecticut." See Decl. of DL ¶ 31.

Upon information and belief, in or about, the third quarter of 2023, while both were still employed by Shoreline, Mark and David A. Lionetti began secretly planning to open a new, competing, pool renovation and service business. See Decl. of DL ¶ 9, 25.  David A. Lionetti used his Shoreline e-mail account to draft a mission statement for "L&P Renovations." See Decl. of DL ¶ 10. See Decl. of DL, Exhibit B. At or about this same time, Mark and David A. Lionetti began to misappropriate Shoreline's Confidential and Proprietary Information. Shoreline limited access to its Confidential and Proprietary Information to employees with a login. See Decl. of DL ¶ 18 – 19. The Employee Handbook contained a Confidentiality Provision, advising all of its employees,

3

including Mark and David A. Lionetti, that its customer list, its pricing, and its supplier information was confidential and should not be used outside of Shoreline. See Decl. of DL ¶ 21 – 24. See Decl. of DL, Exhibit F.

Legacy was incorporated, by and for Mark and David A. Lionetti under Florida law on March 22, 2024, however, David A. Lionetti only resigned his employment with Shoreline on April 15, 2024. See Decl. of DL ¶ 8, 11, 13. See Decl. of DL, Exhibit C and E. Legacy registered to do business in Connecticut on or about April 10, 2024. See Decl. of DL ¶ 12. See Decl. of DL, Exhibit D. Since April 10, 2024, Legacy has actively solicited, signed, and/or acquired at least twelve (12) of Shoreline's service clients under new contracts, diverting them away from Shoreline and causing significant harm to its business relationships and revenue. See Decl. of DL ¶ 26 – 28. See Decl. of DL, Exhibit G.

On or about May 28, 2024, David A. Lionetti reached out to a supplier of Shoreline, CPTnS, and affirmatively misstated the following: "I am the owner of Shoreline pools out of Stamford CT which we [sic] order many products. We have branched off to a new name called legacy [sic]." See Decl. of DL ¶ 42. See Decl. of DL, Exhibit I. Upon information and belief, this is but one incident of many wherein Legacy sought falsely to portray itself as Shoreline or somehow affiliated or associated with Shoreline. See Decl. of DL ¶ 41. This was all part of a larger strategy by Legacy of deceptively attempting to trade on Shoreline's good name and its decades long reputation for quality work and service.

On its website, Legacy falsely and misleadingly alleges that it is "… a premier pool and spa company in the US, boasting over 50 years in the industry and spanning three generations." See Decl. of DL ¶ 32. These statements are categorically false. Legacy was, when it first posted this statement on its website, in business for less than two (2) months. See Decl. of DL ¶ 12. See

4

Decl. of DL, Exhibit D. This statement describes Shoreline, not Legacy, and was posted with the intent to deceive consumers into believing that Legacy was the same as Shoreline or somehow affiliated with Shoreline. See Decl. of DL ¶ 33. Legacy's deceptive advertising is further evidenced in the "About Us" section of its website. The reference to "completing over 3,000 pool projects" inaccurately describes Legacy and instead refers to Shoreline's accomplishments. See Decl. of DL ¶ 32 – 33.   Upon information and belief, Legacy does not engage in pool construction but limits its operations to renovation and service work. Moreover Legacy, having opened for business after April 15, 2024, cannot credibly claim to have completed 3,000 pool projects. This claim misappropriates Shoreline's long-established record of work, further misleading clients and the public about Legacy's capabilities and experience.

Legacy's false advertising and the harm caused to Shoreline's reputation, image, and customer confidence are further demonstrated by multiple misleading claims on Legacy's website. In the "About Us" section, Legacy falsely claims that "[w]e follow strict safety guidelines. Protecting our clients and team is our top priority," misleading customers into believing they adhere to high safety standards. In reality, this is far from the truth, as neither Mark nor David A. Lionetti hold a valid Pool and Spa Maintenance & Repair ("SP-1") license, which is required in the State of Connecticut to legally perform pool and spa maintenance and repair work. See Decl. of DL ¶ 34 – 35. See Decl. of DL, Exhibit H. Mark's license is currently inactive, meaning Legacy's services are not only misrepresented but also illegal (i.e. unlicensed), further undermining customer trust and exposing clients to unlicensed and potentially unsafe practices.

Once it learned of these deceptive trade practices, Shoreline attempted to stop Legacy's unfair and deceptive business practices to no avail. For example, Shoreline sent a cease-and-desist letter on June 14, 2024. See Decl. of DL ¶ 46. See Decl. of DL, Exhibit J. Once it became evident

that these measures were insufficient to stop Legacy's improper conduct, Shoreline filed a complaint and this motion for a preliminary injunction to protect its rights.

## LEGAL STANDARD

To prevail on a motion seeking a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). The Second Circuit uses a four-factor test when considering whether to issue an injunction. *Lego A/S v. Best-Lock Const. Toys, Inc.*, 874 F. Supp. 2d 75, 80 (D. Conn. 2012). Although this test originated in the copyright context, it has been "intimat[ed] that the *eBay* formation applies to all applications for preliminary injunctions." *Id.* (citing *Salinger v. Colting,* 607 F.3d 68, 77, 78 n. 7 (2d Cir. 2010)).

> "Under the *eBay* test as developed in *Salinger,* the court must consider four factors. First, the party requesting the injunction must demonstrate either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *Salinger* at 79. Second, the movant must show that it is likely to suffer irreparable injury in the absence of an injunction, paying particular attention to the question of whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury. *Id.* at 80. Third, the court must consider the balance of hardships between the parties and grant the injunction only if that balance tips in the movant's favor. *Id.* Fourth, the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction."

*Lego A/S*, 874 F. Supp. 2d at 80. (internal quotation marks omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). The moving party "is not required to prove his case in full at a preliminary injunction hearing" "and the findings of facts and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.*

**ARGUMENT**

I.      <u>The Court Should Grant Shoreline's Preliminary Injunction Because It Will Succeed on the Merits of All of Its Claims.</u>

A.    <u>Shoreline Is Likely to Succeed on the Merits of Its DTSA Claim.</u>

Shoreline is likely to prevail on its misappropriation of trade secrets claim under the DTSA. The DTSA provides a civil cause of action for "[a]n owner of a trade secret that is misappropriated […] if the trade secret is related to a product or service used in, or intended for use in, interstate […] commerce." 18 U.S.C. §1836(b)(1). To assert a claim for misappropriation of trade secrets under the DTSA, Shoreline must show it owned a trade secret that is related to a service in interstate commerce. Trade secrets are defined, in pertinent part, as "business […] information" that "the owner thereof has taken reasonable measure to keep such information secret and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. §1839(3). Misappropriation is defined as "disclosure or use of a trade secret of another without express or implied consent by a person who […] at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was […] acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret […]." 18 U.S.C. §1839(5)(B)(ii)(II).

Shoreline is a proper plaintiff because it owns the trade secrets at issue that are used in interstate commerce. On its website, Shoreline states that it conducts business "along the Northeast coast and within the New York Tri-state area." The customer list, supplier information, and pricing information are trade secrets. See Decl. of DL ¶ 15 – 17.  Shoreline limited access to this

information to individuals with a login and did not publish the list or allow anyone without login information to access the list, constituting a reasonable measure to protect this information. See Decl. of DL ¶ 15 – 19. Additionally, this information derived value from not being public knowledge as the customer list allowed Shoreline to conduct business with its existing client base, and its supplier and pricing information made it competitive. See Decl. of DL ¶ 15 – 17, 20. Furthermore, the identity, contact information, needs, and pricing offered to Shoreline's customers is not readily discoverable through public sources but rather is a by-product of years of industry trade practice and Shoreline's proprietary efforts to gather, sort, organize and analyze its customer's data. See Decl. of DL ¶ 16. Therefore, acquiring this information improperly would result in financial gain. See Decl. of DL ¶ 20. These trade secrets were misappropriated. At the time of Shoreline's disclosure of its trade secrets to Mark and David A. Lionetti, they knew and had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain secrecy or limit the use of the trade secrets, evidenced in part by the use of password protected databases and the Confidentiality Provision contained in the Employee Handbook. See Decl. of DL ¶ 14, 18 – 19, 21 – 24. See Decl. of DL, Exhibit F. In addition to being a former employee, Mark was, and continues to be, an equity owner of Shoreline. See Decl. of DL ¶ 5, 7. Shoreline has not consented to the disclosure or use of its trade secrets by Legacy, by and through its officers, Mark and David A. Lionetti and the misappropriation of the customer list has resulted in, at least, twelve of Shoreline's clients leaving Shoreline and signing contracts or doing business with Legacy. See Decl. of DL ¶ 28. See Decl. of DL, Exhibit G. Upon information and belief, Legacy also misappropriated Shoreline's pricing information and supplier list.

Shoreline is likely to prevail on its claim under the DTSA. Shoreline owned trade secrets – its customer list, supplier information, and pricing information – that are considered trade secrets because it took reasonable efforts to keep them secret; the trade secrets derived value from being secret, resulting in value from their improper disclosure. Shoreline uses these secrets in its business that operates in interstate commerce. Legacy misappropriated these trade secrets because without consent, it disclosed them knowing and having reason to know the way in which Mark and David A. Lionetti acquired them gave rise to a duty to keep or limit the use of the trade secrets. For the foregoing reasons, the Court should enjoin Legacy from using Shoreline's Confidential and Proprietary Information to solicit or service former and current customers of Shoreline.

B.  <u>Shoreline Is Likely to Succeed on the Merits of Its CUTSA Claim.</u>

Shoreline is likely to succeed on its misappropriation of trade secrets claim under CUTSA. The requisite elements of a claim for misappropriation of trade secrets under CUTSA mirror the DTSA, as discussed *supra*. Notably, however, "cost data" and "customer list" are explicitly identified as trade secrets. Conn. Gen. Stat. § 35-51(d). The General Statutes of Connecticut § 35-51(d) require that a trade secret "(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Conn. Gen. Stat. § 35-51(d). The General Statutes of Connecticut § 35-51(b)(2)(iii) defines misappropriation in pertinent part as "disclosure or use of a trade secret of another without express or implied consent by a person who […] at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was […] derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."

Shoreline's customer list, supplier information, and pricing information are trade secrets pursuant to the General Statutes of Connecticut § 35-51(d). Cost data and customer list are explicitly contemplated by the statute as trade secrets. Shoreline took reasonable measures to protect its customer list by requiring employees to have a password to login to access it. See Decl. of DL ¶ 18 – 19. Shoreline did not publish the list or allow anyone without login information to access the list and Shoreline had a written Confidentiality Policy contained within its handbook. See Decl. of DL ¶ 15, 21 – 22. Furthermore, the identity, contact information, needs and pricing offered to Shoreline's customers is not readily discoverable through public sources but rather is a by-product of years of industry trade practice and Shoreline's proprietary efforts to gather, sort, organize and analyze its customer's data. See Decl. of DL ¶ 16. Therefore, it would be difficult to acquire the customer list without using improper means, such as, obtaining the list through Mark and David A. Lionetti. Shoreline used the same reasonable measures to protect its pricing information and supplier and vender list. See Decl. of DL ¶ 18 – 22. Shoreline has also developed a network of suppliers and vendors, whose identities are not all commonly known in the marketplace. Through years of effort Shoreline has created vendor relationships and has developed relationships affording unique and confidential pricing. The identity of and information relating to Shoreline's suppliers/vendors and preferential pricing offers are essential trade secrets, and access to this information at Shoreline is and has always been strictly limited and protected. See Decl. of DL ¶ 17.

Shoreline's customer list and pricing information derived economic value from not generally known or readily ascertainable without login access as these lists and information allowed it to conduct business with its existing client base, and its pricing information made them competitive. See Decl. of DL ¶ 15 – 17, 20. Acquiring this non-public information would allow

the person who did so to obtain actual, independent economic value by stealing clients from Shoreline and undercutting Shoreline's pricing, both of which, based on information and belief, Legacy did, by and through its officers, Mark and David A. Lionetti.

Legacy misappropriated Shoreline's customer list, by and through its officers, Mark and David A. Lionetti, resulting in, at least, twelve of Shoreline's clients leaving Shoreline and signing contracts with, or using Legacy. See Decl. of DL ¶ 27 – 28. See Decl. of DL, Exhibit G. Upon information and belief, Legacy also misappropriated Shoreline's pricing information. At the time of Shoreline's disclosure of its trade secrets to Mark and David A. Lionetti, they knew and had reason to know that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain secrecy or limit the use of the trade secrets, evidenced in part by the use of password protected databases. It is well-settled that even after David A. Lionetti's and Mark's employment at Shoreline ceased, they remained subject to a duty not to use Shoreline's trade secrets, or other confidential information, which they acquired in the course of their employment at Shoreline for their own benefit or that of Legacy's to the detriment of Shoreline. *Elm City Cheese Company, Inc., et al. v. Federico*, 752 A.2d 1037, 1044 (Conn. 1999), (quoting *Allen Mfg. Co. v. Loika*, 145 Conn. 509, 514, 144 A.2d 306 (1958)).  Shoreline has not consented to the disclosure or use of its trade secrets by Legacy, by and through its officers, Mark and David A. Lionetti.

Shoreline is likely to succeed in its CUTSA claim. Shoreline's cost data and customer list are trade secrets because Shoreline derived economic value from them being secret, resulting in economic value when used improperly, and made reasonable efforts to maintain secrecy. The cost data and customer list were misappropriated because Legacy used trade secrets, knowing Mark and David A. Lionetti had a duty to maintain secrecy. For the foregoing reasons, the Court should enjoin Legacy from using that information to solicit or service former and current customers of Shoreline.

C.  Shoreline Is Likely to Succeed on the Merits of Its Lanham Act Claim.

Shoreline is likely to succeed on its false advertising claim under the Lanham Act. The Lanham Act, 15 U.S.C. § 1125(a), states: "Any person who, or in connection with any goods or services, […], uses in commerce any […] false or misleading description of fact, or false or misleading representation of fact, which […] in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

Legacy falsely claims on its website to "boast over 50 years in the industry and span three generations," as well as stating that "Mark and young Dave [have completed] over 3,000 pool projects." See Decl. of DL ¶ 32. Legacy's claims are entirely baseless. Shoreline, founded in 1969, is the business that spans three generations, while Legacy, incorporated on March 22, 2024, spans only two generations—Mark and his son, David A. Lionetti. See Decl. of DL ¶ 3, 11, 33. See Decl. of DL, Exhibit C. Legacy is deliberately misleading customers by attempting to trade on Shoreline's longstanding reputation, which has been built over decades of hard work and success in the industry. The false nature of Legacy's deceptive advertisements had the capacity to deceive consumers and, upon information and belief, did deceive consumers.

Upon information and belief, said deceptive advertisement had a material effect on where consumers chose to do business. When deciding where to do business, consumers undoubtedly appreciate longstanding family businesses. The history of a company, especially its years of experience, is inherent to the quality of the service and affects a consumer's decision when choosing between competitors. Here, Shoreline and Legacy both highlight fifty years of experience. See Decl. of DL ¶ 31 – 32.  Albeit, only Shoreline can honestly make that claim. See

Decl. of DL ¶ 33. Insofar as Legacy published these false statements on its website, that is publicly available and contains contact information for consumers to conduct business with Legacy, it had the capacity to affect interstate commerce, and, upon information and belief, did so affect interstate commerce.

Although Legacy was aware that it was not in the industry for fifty years, did not span three generations, and did not complete anywhere close to 3,000 pool projects, Legacy nevertheless made these claims on its website to mislead potential customers about Legacy's history, expertise and composition. Legacy knew that these false claims would cause consumer confusion as to the history and composition of Legacy with the intent to mislead potential customers to believe its history and composition were the same as Shoreline's, or worse, that it was Shoreline operating under a "new name." Upon information and belief, Legacy's use of these false statements did, in fact, cause consumer confusion as to the history and composition of Legacy.

Shoreline suffered and continues to suffer from the misappropriation of its history and from there misleading advertising. As a competitor, Legacy misappropriated Shoreline's history and falsely implied Shoreline's prior projects were its own prior projects in an attempt to attract customers that otherwise may have chosen Shoreline to do their pool work, instead of choosing Legacy. In addition, Legacy improperly trades on Shoreline's good name and reputation in dealing with suppliers and potential customers, thereby further confusing and deceiving the consuming public.

Shoreline is likely to prevail on its Lanham Act claim. Legacy included false statements and misleading use of corporate history on its website that, upon information and belief, deceived and continue to deceive the public. These deceptions are material as, upon information and belief, they affect where consumers choose to do business. These false statements and misleading history

are in interstate commerce since they are published on Legacy's website. Shoreline has been injured by these false statements and misleading advertising because they cause consumer confusion. For the foregoing reasons, the Court should grant Shoreline's preliminary injunction requiring Legacy to remove the false advertising – i.e. false or misleading statements and corporate history – from its website.

### D.    Shoreline Is Likely to Succeed on the Merits of Its CUTPA Claim.

The General Statutes of Connecticut § 42-110b state "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The legislature intended for this statute to be remedial and to be so construed. Conn. Gen. Stat. § 42-110b. Legacy engaged and continues to engage in several unfair trade practices that violate the CUTPA. The majority of these claims relate to its false advertising, as discussed *supra.* The statements that misappropriate Shoreline's history and identity constitute the false advertising. See Decl. of DL ¶ 31 – 33.  In addition to false advertising, Legacy's officer, David A. Lionetti, pretended to be the owner of Shoreline and that Legacy branched off of Shoreline in an email to one of Shoreline's suppliers. See Decl. of DL ¶ 41 – 44. See Decl. of DL, Exhibit I. Finally, in addition to false advertising and pretending to be Shoreline, Legacy and Legacy's officer, Mark, lack the requisite licenses – a SP-1 license and, upon information and belief, a swimming pool builder's license. See Decl. of DL ¶ 31 – 35. See Decl. of DL, Exhibits H and I. Failure to have proper licenses is statutorily "deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b." Conn. Gen. Stat. § 20-341(f). See Decl. of DL ¶ 36.

Shoreline is likely to succeed on the merits of its CUTPA claims. Legacy's false advertising, David A. Lionetti pretending to be Shoreline, and Legacy falsely equating itself to Shoreline with these practices, while operating without a license, are meritorious claims of unfair

and deceptive trade practices. Notably, the failure to operate with proper licenses is explicitly deemed a violation of 42-110b by the General Statutes of Connecticut. For the foregoing reasons, the Court should grant Shoreline's preliminary injunction requiring Legacy to remove Legacy's false or misleading statements about Legacy's history and identity from its website and stop impersonating Shoreline.

      E.   <u>Shoreline Is Likely to Succeed on the Merits of Its Tortious Interference Claim.</u>

Shoreline did business with, at least, twelve clients that were solicited by and ultimately decided to do business with Legacy in place of Shoreline. See Decl. of DL ¶ 27 – 28. Legacy knew these clients did business with Shoreline because it misappropriated Shoreline's Confidential and Proprietary Information to solicit these customers away from Shoreline. Legacy, using the wrongful means of misappropriating Shoreline's Confidential and Proprietary Information, induced existing Shoreline's clients to discontinue, breach, or not renew, their service contracts with Shoreline and, instead, to enter contracts with Legacy. See Decl. of DL ¶ 27 – 28. But for Legacy's wrongful misappropriation and use of Shoreline's Confidential and Proprietary Information, these clients would have continued to contract with Shoreline and pay for its services. Furthermore, as set forth *supra,* Legacy misrepresented itself by misappropriating Shoreline's history to induce customers to choose Legacy over Shoreline. As a direct and proximate result of Legacy's wrongful actions, Shoreline was, and continues to be, damaged in the form of lost service business revenue.

Shoreline is likely to prevail on its Tortious Interference claim. Shoreline was in a business relationship with the twelve clients solicited by Legacy. Legacy knew about this relationship because it solicited the clients using Shoreline's Confidential and Proprietary Information that it maliciously took to solicit these clients. Shoreline suffered and continues to

suffer the loss of service business revenue. For the foregoing reasons, the Court should grant Shoreline's preliminary injunction and enjoin Legacy from soliciting or servicing former and current customers of Shoreline, require Legacy to remove the false advertising from its website, and stop impersonating Shoreline.

F.   Shoreline Need Only Show Its Claims Raise Sufficiently Serious Questions Going to the Merits to Make Them Fair Ground for Litigation and the Balance of Hardships Tip Decidedly in Its Favor.

Under Connecticut law, as set forth in *Lego A/S*, the first factor for a preliminary injunction can be established in two different ways. 874 F. Supp. 2d at 80. ("First, the party requesting the injunction must demonstrate either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."). Subsection (b) seems to be a lower standard of proof than subsection (a), which requires "a likelihood of success on the merits." *Id*. Therefore, if a party is unable to establish likely success on the merits, it can still prevail on the first factor by a showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Id*.

Shoreline is likely to succeed on the merits of all of its claims, as discussed *supra*. If the Court finds that it is not likely to succeed on the merits of its claims, in the alternative, Shoreline raises "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Lego A/S*, 874 F. Supp. 2d at 80. As discussed *infra*, the balance of hardships decidedly favors Shoreline as it suffers irreparable harm while Legacy would continue to profit from illegal activity.

16

For the foregoing reasons, the Court should enjoin Legacy from soliciting or servicing former and current customers of Shoreline, require Legacy to remove the false advertising from its website, and stop impersonating Shoreline.

II.    **The Court Should Grant Shoreline's Preliminary Injunction Because Shoreline Suffers and Will Continue to Suffer Irreparable Harm Without a Preliminary Injunction.**

As a result of Legacy's unlawful acts, Shoreline has been irreparably harmed and will continue to suffer irreparable harm in the absence of a preliminary injunction because Legacy's ongoing deceptive acts, which are prominently displayed on its website, coupled with its operating without a valid license, pose a continuing threat to Shoreline. Additionally, Legacy's continued use of Shoreline's trade secrets will enable them to further mislead clients and confuse consumers, exacerbating the damage to Shoreline's business and reputation. See Decl. of DL ¶ 38. Shoreline has no adequate remedy at law because monetary damages alone cannot sufficiently compensate for the injuries it has sustained—and will continue to sustain—if Legacy's conduct is not enjoined. First, the ongoing deception by Legacy is damaging Shoreline's hard-earned reputation and goodwill, which are intangible assets that cannot be easily quantified or restored through financial compensation. Each day that Legacy misappropriates Shoreline's identity and trade secrets, Shoreline loses business opportunities and client trust that took it decades to build, and such trust, once broken, cannot be fully repaired monetarily. See Decl. of DL ¶ 39. Second, the competitive advantage Legacy gains from unlawfully using Shoreline's trade secrets and misleading advertising creates a persistent, unfair distortion in the marketplace that harms Shoreline in ways that damages cannot remedy. This includes loss of market share, client confusion, and long-term damage to Shoreline's standing in the industry—injuries that are inherently difficult, if not impossible, to reverse or accurately compensate through monetary relief.

In *Lego A/S*, the court found the loss of goodwill resulting from "the uncertain delivery of [defendant's] minifigures" "may constitute irreparable harm supporting an injunction." 874 F.Supp.2d at 105. The court acknowledged "[t]his [the irreparable harm supporting an injunction] is the case because it is generally difficult for a court to quantify such losses for the purpose of awarding money damages." *Id*. Additionally, *Lego A/S* explains that a delay of six months is not necessarily prohibitive to a finding of irreparable harm when "the movant was actively dealing with the problem in the meantime." *Id*. at 106, citing *Fisher–Price Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 125 (2d Cir.1994); *Weight Watchers Intern. v. Luigino's, Inc.,* 423 F.3d 137, 144–45 (2d Cir.2005). In *Lego A/S*, the defendant did not file for a preliminary injunction for six months after the seizure, but during that time, the defendant corresponded with Lego and filed a petition with the CBP. *Id*. at 105 – 106.

Here, Shoreline stands to lose its reputation, goodwill, business opportunities, client trust, and competitive advantage, all of which are difficult to quantify, especially its reputation, goodwill, and client trust. These endangered characteristics resemble the loss of goodwill at risk in *Lego A/S.*

Legacy registered to conduct business in Connecticut in April 2024, since shortly after Legacy opened for business, Shoreline dealt with this issue by writing a cease-and-desist letter in an attempt to rectify the situation without seeking legal recourse. See Decl. of DL ¶ 12, 46. See Decl. of DL, Exhibit D and J. Once these efforts proved unsuccessful, Shoreline filed a complaint and the current motion to vindicate its rights. Shoreline has not delayed in seeking this relief.

Additionally, irreparable harm ties to the purpose of a preliminary injunction, which "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas*, 451 U.S. at 395. The moving party "is not required to prove his case in full at a preliminary injunction hearing." *Id*. As discussed *supra*, Shoreline is likely to succeed on the merits

of all of its claims, and therefore, also fulfills the lesser standard of raising "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Lego A/S*, 874 F. Supp. 2d at 80. To prevent Shoreline and the consuming public from continued harm as a result of Legacy's conduct, this Court should grant the preliminary injunction.

III.    **The Court Should Grant Shoreline's Preliminary Injunction Because the Equities Balance in Shoreline's Favor.**

As discussed *supra*, Mark Lionetti, as a shareholder of Shoreline, and David A. Lionetti, as former employees of Shoreline, either knew or should have known that the confidential business information they had access to constituted proprietary trade secrets. This information was not to be disclosed, shared, or provided to the general public, let alone a competitor. The balance of equities supports Shoreline because a preliminary injunction would simply enforce a duty that David A. Lionetti and Mark Lionetti were already obligated to uphold.

While restricting Legacy's use of Shoreline's confidential business information may impact their ability to conduct business derived from those trade secrets, this enforcement is both reasonable and necessary. It does not prevent Legacy from legitimately obtaining comparable clients in the marketplace. Any harm to Legacy would merely arise from requiring them to fulfill their duties and obligations with Shoreline.

In contrast, the harm inflicted on Shoreline by Legacy's misappropriation of its trade secrets would result in ongoing and immeasurable losses. Therefore, the harm to Shoreline significantly outweighs any harm to Legacy. Accordingly, the balance of equities justifies the issuance of a preliminary injunction. *A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 301 (D. Conn. 2015).

19

**IV.    The Court Should Grant Shoreline's Preliminary Injunction Because Granting Shoreline's Preliminary Injunction Is in the Public Interest.**

It is in the public interest to grant Shoreline's preliminary injunction. "[T]he public has an interest in not being deceived." *Illinois Tool Works Inc. v. J-B Weld Co., LLC*, 419 F. Supp. 3d 382, 405 (D. Conn. 2019), modified, No. 3:19-CV-01434 (JAM), 2019 WL 7816510 (D. Conn. Dec. 20, 2019), citing *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010). Albeit it originated in the copyright context, this principle applies to Legacy's deceptive practices. Legacy is deceiving the public with its false statements about its history and experience, adhesion to safety protocol when it is not licensed, and pretending to be Shoreline through correspondence by its officer, David A. Lionetti. See Decl. of DL ¶ 31 – 37, 41— 44 . See Decl. of DL, Exhibits H and I. These practices improperly deceive the public.

Companies and employees benefit from prohibiting the misappropriation of trade secrets. When passing the DTSA, Congress acknowledged "trade secret theft harms owner companies and their employees." 20161890, CRS Summary, 114th Congress (2015-2016). Here, Shoreline and its employees are injured. However, harm from the theft of trade secrets extends more broadly. Therefore, preventing the misappropriation of trade secrets helps companies and employees beyond Shoreline.

Additionally, CUTPA, in particular, serves a remedial purpose. Conn. Gen. Stat. § 42-110b(d) ("It is the intention of the legislature that this chapter be remedial and be so construed."). Given that this statute is intended to be remedial, it seems it has the potential to protect the public from more conduct that may not be covered by other statutes.

The public benefits from the enforcement of laws designed to protect consumers and promote fair competition. The Lanham Act, DTSA, and CUTPA exist to prevent deceptive

business practices and unfair competition, each of which undermines consumer trust and marketplace integrity.

## CONCLUSION

For the foregoing reasons, Shoreline respectfully requests that this Court issue a preliminary injunction and, thereafter, a permanent injunction enjoining Legacy from using Shoreline's Confidential and Proprietary Information to solicit and service former and current customers of Shoreline, requiring it to remove the false advertising from its website, and requiring it stop impersonating Shoreline during the pendency of this action.

Respectfully submitted,

**THE LAW OFFICES OF
NEAL BRICKMAN, P.C.**

*/s/ Neal Brickman*
Neal Brickman, Esq. (*pro hac vice*)
420 Lexington Avenue, Suite 2811
New York, NY 10107
Telephone: (212) 986-6840
Facsimile: (212) 986-7691
neal@brickmanlaw.com

*/s/ Ethan Y. Leonard*
Ethan Y. Leonard, Esq. (*pro hac vice*)
420 Lexington Avenue, Suite 2811
New York, NY 10107
Telephone: (212) 986-6840
Facsimile: (212) 986-7691
ethan@brickmanlaw.com

**PHILIP RUSSELL, LLC**
*/s/ Philip Russell*
Philip Russell, Esq.
Federal Bar No. ct03127
1 River Road

21

Cos Cob, CT 06807
Tel: (203) 661-4200
E-mail: efile@greenwichlegal.com

*Attorneys for Plaintiff Shoreline Pools, Inc.*